**11 CIV 8888**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONTEXT PARTNERS FUND, L.P., on behalf of itself and all others similarly situated,<br><br>         Plaintiff,<br><br>- against -<br><br>JON S. CORZINE, HENRI J. STEENKAMP, DAVID P. BOLGER, EILEEN S. FUSCO, DAVID GELBER, MARTIN GLYNN, EDWARD L. GOLDBERG, DAVID I. SCHAMIS and ROBERT S. SLOAN,<br><br>         Defendants. | **CIVIL ACTION NO.**<br><br>**JURY TRIAL DEMANDED**<br><br> |

## COMPLAINT FOR VIOLATIONS
## OF THE FEDERAL SECURITIES LAWS

EC.47081.3

## TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION ................................................................ 2

II.    JURISDICTION AND VENUE ............................................................... 9

III.   THE PARTIES ................................................................................... 10

       A.   Plaintiff ................................................................................. 10

       B.   Defendants ............................................................................ 10

IV.    RELEVANT NON-PARTY ................................................................. 13

V.     FACTUAL BACKGROUND ............................................................... 13

       A.   Defendant Corzine Seeks To Transform MF Global Into
            A Full Service Investment Bank At All Costs .......................... 13

       B.   MF Global's Exposure To The European Debt Crisis ............... 16

       C.   The Public Offering Materials Materially Misstate And Omit
            Material Facts Concerning The Adequacy Of MF Global's Risk
            Management, Liquidity And Internal Controls ......................... 20

       D.   MF Global Sustains A Net Capital Deficit In Connection With
            Its European Sovereign Debt Holdings .................................... 22

       E.   MF Global's Downfall ............................................................ 24

VI.    DEFENDANTS' VIOLATIONS OF SECTIONS 11 AND 15  OF
       THE SECURITIES ACT ...................................................................... 29

       A.   Materially False And Misleading Statements And Omissions Of
            Material Fact In The Securities Offerings ............................. 129

       B.   Materially False And Misleading Statements And Omissions Of
            Material Fact In The Documents Incorporated By Reference ........ 34

            1.   2011 Form 10-K ............................................................ 34

                 a.   Materially False and Misleading Statements
                      and Omissions of Material Fact Concerning MF
                      Global's Risk Management Protocols and Processes ......... 35

                 b.   Materially False and Misleading Statements and
                      Omissions of Material Fact Concerning the Adequacy
                      of MF Global's Liquidity and Working Capital ............. 37

                 c.   Materially False and Misleading Statements and
                      Omissions of Material Fact Concerning
                      MF Global's Internal Controls ...................................... 39

            2.   July 7, 2011 Definitive Proxy Statement ....................... 42

            3.   July 28, 2011 Form 8-K .............................................. 44

i

       4.     First Quarter 2012 Form 10-Q ................................................................ 46

           a.     Materially False and Misleading Statements and
                 Omissions of Material Fact Concerning MF Global's
                 Risk Management Protocols and Processes ................................. 47

           b.     Materially False and Misleading Statements and
                 Omissions of Material Fact Concerning the
                 Adequacy of MF Global's Liquidity and Working Capital .......... 51

           c.     Materially False and Misleading Statements and
                 Omissions of Material Fact Concerning MF Global's
                 Internal Controls ........................................................................... 56

       5.     August 3, 2011 Form 8-K ........................................................ 58

VII.    CLASS ACTION ALLEGATIONS ................................................................ 59

VIII.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR
       AND BESPEAKS CAUTION DOCTRINE ................................................... 61

IX.     CAUSES OF ACTION ................................................................................ 62

COUNT I  FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT
       AGAINST THE DEFENDANTS ................................................................... 62

COUNT II  FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT
       AGAINST THE DEFENDANTS ................................................................... 64

X.      PRAYER FOR RELIEF .............................................................................. 65

XI.    JURY TRIAL DEMANDED ......................................................................... 66

Plaintiff Context Partners Fund, L.P. ("Plaintiff" or "Context") brings this action individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired the debt securities (collectively, the "Bond Class Securities") in or traceable to the July 28, 2011 offering of 3.375% Senior Convertible Notes due 2018 (the "July 28, 2011 Offering" or the "3.375% Notes") and/or the August 3, 2011 offering of 6.250% Senior Notes due 2016 (the "August 3, 2011 Offering" or the "6.250% Notes") (collectively, the "Offerings") issued by MF Global Holdings Ltd. ("MF Global" or the "Company"), and were damaged thereby (the "Class" or "Class Members").

Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based on, *inter alia*, the investigation of Plaintiff's counsel, Entwistle & Cappucci LLP. This investigation included, but was not limited to, a review of: (i) public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of MF Global investor conference calls; (iv) press releases and media reports; (v) economic analyses of securities movement and pricing data; (v) publicly available legal actions involving MF Global and related parties; (vi) media and economic reports regarding the European debt crisis; and (vii) consultation with damage experts.

Plaintiff's investigation into the factual allegations contained herein is continuing, and many of the facts related to Plaintiff's allegations are known only by MF Global and the Defendants named herein, or are exclusively within their custody and control. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. The claims asserted herein pursuant to the Securities Act of 1933 (the "Securities Act") do not sound in or arise from allegations of fraud.

## I.      SUMMARY OF THE ACTION

1.      This action arises out of the collapse of MF Global which was caused by the Company's wholesale disregard for its purported risk management and internal controls as MF Global sought to transform itself from a broker-dealer into a full service investment bank at all costs. Part of this "strategic" transformation included increasing MF Global's own proprietary trading in highly risky European sovereign debt. This strategy utterly failed and Defendants (as defined in Section III.B.) sought to bail out MF Global by raising desperately needed capital through the materially false and misleading Public Offering Materials[1] in connection with the Offerings. Plaintiff and other Class Members seek recovery from Defendants for causing the Company to make untrue statements and omissions of material fact in the Public Offering Materials.

2.      As set forth in more detail herein, based upon the insatiable risk appetite of MF Global's Chief Executive Officer, Defendant Jon S. Corzine ("Corzine"), in early 2011, the Company invested billions of dollars in European sovereign debt at a time when the Company was undercapitalized and struggling with severe liquidity issues. Due to MF Global's dire need for working capital and liquidity, it aggressively sought fresh capital from Plaintiff and other Class Members through the Offerings. Less than three months after MF Global raised $650 million from Plaintiff and other Class Members, MF Global filed for involuntary Chapter 11 bankruptcy.

3.      During the time of the Offerings, Defendants were well aware of the crippling European debt crisis that adversely affected markets around the world. Indeed, as the European

---

[1] The "Public Offering Materials" for each Offering include the Shelf Registration Statement, the prospectus, applicable prospectus supplement, and all SEC filings incorporated therein, as further described in Section VI.A.

debt crisis became more precarious throughout 2011, the market's concerns escalated regarding the devaluation of European sovereign debt and whether certain European countries would default on their sovereign debt obligations. Despite these well-documented fears, MF Global, led by Defendant Corzine, disregarded these risks and caused the Company to invest over $6 billion in debt issued by Italy, Spain, Portugal, Belgium and Ireland at a time when these countries had (and continue to have) some of the worst economies in the European Union.

4.      MF Global's involuntary bankruptcy came after months of desperately seeking liquidity and working capital from the market, including Plaintiff and other Class Members, to stave off margin calls and other cash demands from MF Global's trading partners and large clients in direct response to the deteriorating values and possible defaults on the European sovereign debt the Company held. While it was clear that MF Global carelessly "bet the company" by acquiring such an enormous position in European sovereign debt without adequate liquidity or working capital, Defendants repeatedly made and/or caused the Company to make untrue statements and/or omissions of material fact in the Public Offering Materials that portrayed MF Global as having and utilizing its purported "robust" risk management practices and controls, while being well-capitalized through its "multiple sources" of liquidity. Indeed, the Company even falsely stated that it had "excess capital to provide liquidity during periods of unusual market volatility." The reality, however, was that MF Global wholly failed to assess and manage the risks involved with its European sovereign debt holdings and did not have sufficient liquidity or working capital to remain solvent given the cash and other collateral demands by its trading partners and clients required to offset the losses in the value of these assets.

5.      In the end, Plaintiff and other Class Members did not learn the truth about MF Global's failed risk controls and insufficient liquidity until October 31, 2011, when the Company

3

filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York. At that time, the 3.375% Notes and the 6.250% Notes had lost approximately 60% and 55% of their value, respectively, since the time of the Offerings.

6.      The months leading up to MF Global's bankruptcy have been well-documented. Prior to its bankruptcy, MF Global, together with it subsidiaries, purported to be one of the world's leading brokers in markets for commodities and listed derivatives. The Company stated that it provided access to more than 70 exchanges globally and was an active broker-dealer in markets for fixed income securities, equities and foreign exchange.

7.      In March 2010, Defendant Corzine became Chairman and Chief Executive Officer of MF Global. Prior to becoming MF Global's CEO, Corzine was a former CEO of Goldman Sachs Group Inc., now known as Goldman Sachs & Co. ("Goldman Sachs"), and a former senator and Governor of New Jersey. Soon after Corzine became Chairman and CEO of MF Global, he campaigned for the Company to increase its risk using its own money for proprietary trading, including making investments in European sovereign debt at a time when that debt had plummeted in value. It was widely reported that Corzine had a voracious risk appetite stemming back from his days at Goldman Sachs and wanted to transform MF Global from a futures and commodities broker-dealer into a full service investment bank.

8.      Corzine's push into highly risky proprietary trading with the Company's money was central to MF Global's profit-growing plan and "strategic" transformation. The Defendants caused the Company to represent that it could grow and transform its business without taking on excessive risk, while maintaining adequate capital and liquidity. The truth, however, was quite different as MF Global was severely undercapitalized, exposed to excessive risk due to massive

4

bets on sovereign debt issued by certain European countries, and had inadequate internal controls
and risk management in place to manage these risks.

9.       In early 2011, the Defendants, led by Corzine, caused the Company to enter into
"repurchase-to-maturity" transactions, also known as "repo-to-maturity" transactions
("repurchase transactions" or "repurchase agreements"). MF Global's repurchase agreements
allowed the Company to borrow money in exchange for selling the lender specific securities
which MF Global agreed to buy back at a later date. The collateral that MF Global used in
connection with these repurchase agreements was the European sovereign debt that was issued
by Italy, Portugal, Spain, Belgium and Ireland – countries that were suffering from a severe debt
crisis in which they were struggling to meet their payment obligations to investors.

10.       Indeed, throughout 2011, many media outlets reported on the European debt crisis
that threatened the economies of many of the countries in the European Union. These reports
detailed the mounting pressures these countries faced in meeting their sovereign debt obligations
and the threat that certain countries, most notably Greece, Spain and Italy, could default on their
debt obligations. The reports further detailed the collateral effect the European debt crisis was
having on markets around the world, including the U.S. markets, and how investors were fleeing
from buying European sovereign debt given the enormous risks of devaluation and possible
default on these securities. Despite these known risks, the Defendants caused MF Global to
invest billions of dollars in European sovereign debt.

11.       Shortly after MF Global issued it annual report on Form 10-K for its fiscal year
2011 on May 20, 2011, which first disclosed that the Company held $6.3 billion notional amount
of European sovereign debt, U.S. regulators, including the Financial Industry Regulatory

5

Authority ("FINRA") and the SEC, began questioning MF Global's use of these securities as collateral for its repurchase transactions.

12.     Reportedly, by June 2011, officials at FINRA discussed with Corzine and other senior executives at MF Global whether the Company should set aside more capital for its growing number of repurchase transactions collateralized by European sovereign debt.  As reported by *The New York Times* on November 2, 2011, Corzine resisted setting aside more capital for these transactions, "lobbying to persuade regulators that the firm did not need to raise capital."

13.     It was only in August 2011, when FINRA and the Commodities Future Trading Commission ("CFTC") detected that the Company had a net capital deficit of approximately $150 million due to its exposure to European sovereign debt, that MF Global was ordered to "boost its net capital" to comply with SEC Rule 15c3-1.[2]

14.     On October 24, 2011, Moody's Investors Service, Inc. ("Moody's") downgraded MF Global's credit rating and the rating of its debt to just one notch above junk status over concerns that the Company would not be able to meet its earnings targets and was not adequately managing its risk in connection with its exposure to European sovereign debt.  Specifically, Moody's provided the following reason for downgrading MF Global:

> Moody's . . . said that it has become increasingly concerned with MF Global's risk management and management's ability to prudently balance risk and reward as it undergoes a substantial re-engineering of the firm.
>
> "MF Global's increased exposure to European sovereign debt in peripheral countries and its need to inject capital into its broker-dealer subsidiary to rectify a regulatory capital shortfall highlights

---

[2] SEC Rule 15c3-1 sets certain minimum net capital levels for brokers and dealers to conduct business.

6

the firm's increased risk appetite and raises questions about the
firm's risk governance," said Moody's senior analyst Al Bush.

15.     The next day, on October 25, 2011, MF Global reported a larger than expected net
loss of $186.6 million, or $1.16 per share, for the quarter ended September 30, 2011. The
Company also disclosed its $6.3 billion in exposure to European sovereign debt which Corzine
said was his "personal responsibility and a prime focus of [his] attention." MF Global also noted
that it had $1.3 billion in unused credit facilities, although it did not specify as of what date this
amount had been "unused." Additionally, in response to MF Global's exposure to $6.3 billion in
European sovereign debt, *The Wall Street Journal* stated "[t]hat exposure is huge considering the
firm took in just $12 million in revenue from principal trading during the latest quarter."

16.     On October 26, 2011, Standard & Poor's Rating Services ("Standard & Poor's")
put MF Global's rating on watch for a possible downgrade. The next day, on October 27, 2011,
Fitch Ratings ("Fitch") downgraded MF Global's long-term debt rating to "junk" status. On this
same day, Moody's further downgraded the Company's credit rating and the ratings of its debt to
"junk" status and *Bloomberg* reported that by October 26, MF Global had completely exhausted
its $1.3 billion credit facility and that the Company was actively seeking a buyer for its futures
brokerage subsidiary. Over the next few days, from October 28 through October 30, MF Global
unsuccessfully sought to be acquired by two different companies.

17.     On October 31, 2011, MF Global filed for Chapter 11 bankruptcy. Later that day,
*The New York Times* reported that federal regulators had discovered that hundreds of millions of
dollars in customer money had gone missing from MF Global in recent days. Because of this
missing money, regulators were investigating whether MF Global diverted some customer funds
to support its own trades as a last ditch effort to save the Company.

7

18.     On November 1, 2011, *The Wall Street Journal* reported that as a result of the hundreds of millions of dollars missing from MF Global's client accounts, the CFTC had voted to issue subpoenas to MF Global and the Federal Bureau of Investigation ("FBI") planned to investigate what happened to the missing money.  Additionally, the SEC and Chicago Mercantile Exchange Group ("CME Group") were conducting investigations to determine whether the Company committed serious violations of federal rules and regulations governing the proper maintenance and segregation of client money.

19.     On November 4, 2011, *The Wall Street Journal* reported that MF Global may have disguised its debt levels to investors over the past two years by temporarily slashing its short-term borrowings just before publicly reporting its quarterly results, an activity referred to as "window dressing."  *The Wall Street Journal* stated:  "[i]n each of the past seven quarters from late 2009 through mid-2011, MF Global's quarter-end borrowings were on average 16% lower than the quarterly average."  By temporarily slashing its short-term debt borrowings, the Company was hiding its "true levels of borrowing and risk-taking" which was "of particular concern with MF Global, where borrowings fueled large trades on European sovereign debt that helped lead to the firm's demise."  That same day, Corzine resigned as Chairman and CEO of MF Global.

20.     On November 21, 2011, numerous media outlets including *Bloomberg*, *The Wall Street Journal*, and *The New York Times* reported that the bankruptcy court-appointed trustee overseeing the liquidation of MF Global's U.S. broker-dealer subsidiary estimated that the shortfall in the MF Global's customer funds ***could be more than $1.2 billion***, doubling previous estimates.  *The New York Times* stated that:  "[r]egulators currently suspect that MF Global improperly used customer money for its own purposes in the days before filing for Chapter 11

8

protection, according to people briefed on the matter . . . . Authorities are still searching for the money, and are considering two possibilities. One is that MF Global used the money to meet trading partners' demands for extra cash, which could come back. The other is that it was used to cover trading losses, which would be unrecoverable." On December 3, 2011, *The New York Times* reported that the U.S. House of Representatives Agriculture Committee voted unanimously to force Defendant Corzine to appear at a hearing on December 8, 2011 to face questioning regarding the collapse of the Company.

21.     Plaintiff and other Class Members who purchased the Bond Class Securities in or traceable to the Offerings have suffered enormous damages. Since the time of the Offerings, the Bond Class Securities have collectively plummeted by approximately 65% due to Defendants' materially false and misleading statements and omissions of material fact necessary to make statements not misleading in the Public Offering Materials as detailed herein.

## II.     JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331. The claims alleged herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

23.     Venue is proper in this district pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this district. At all time relevant to this Complaint, the headquarters and principal offices of MF Global were located within this district at 717 Fifth Avenue, New York, New York 10022.

9

24.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

## III.    THE PARTIES

### A.    Plaintiff

25.    Plaintiff Context Partners Fund, L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at 2223 Avenida de la Playa, Suite 104, La Jolla, California 92037.  Context purchased certain Bond Class Securities pursuant to the Shelf Registration Statement and related Public Offering Materials, through its investment manager, Context Capital Management, LLC ("CCM"), as set forth on its certification attached hereto as Exhibit A.  CCM had investment discretion and was authorized to purchase and sell securities on behalf of Context, including the Bond Class Securities, within the guidelines set by Context.  The Public Offering Materials contained material misstatements and omissions of fact.  Context, CCM and their investment personnel were misled by the false and misleading statements set forth herein and suffered damages pursuant to Sections 11 and 15 of the Securities Act.

### B.    Defendants

26.    Defendant Jon S. Corzine ("Corzine") was, at all times relevant hereto, the Chief Executive Officer of MF Global and Chairman of MF Global's Board of Directors.  Corzine is liable for the Offerings completed during his tenure as MF Global's CEO and Chairman of its Board of Directors.  Corzine signed MF Global's annual report on Form 10-K and MF Global's

10

quarterly report on Form 10-Q, which was incorporated by reference into the Public Offering

Materials applicable to the Offerings.

27.     Defendant Henri J. Steenkamp ("Steenkamp") was, at all times relevant hereto,

the Chief Financial Officer of MF Global.  Steenkamp is liable for the Offerings completed

during his tenure as MF Global's CFO.  Steenkamp signed MF Global's annual report on Form

10-K and MF Global's quarterly report on Form 10-Q, which was incorporated by reference into

the Public Offering Materials applicable to the Offerings.  Steenkamp also signed the shelf

registration statement dated September 25, 2009 and the subsequent post-effective amendment

filed with the SEC on February 24, 2010.

28.     Defendant David P. Bolger ("Bolger") has been a member of the Board of

Directors of MF Global since 2010.  Bolger is liable for the Offerings completed during his

tenure as a MF Global director.  Bolger signed the post-effective amendment to the September

25, 2009 shelf registration statement.   The post-effect amendment was filed with the SEC on

February 24, 2010.  Bolger also signed MF Global's annual report on Form 10-K which was

incorporated by reference into the Public Offering Materials applicable to the Offerings.

29.     Defendant Eileen S. Fusco ("Fusco") has been a member of the Board of

Directors of MF Global since 2007.  Fusco is liable for the Offerings completed during her

tenure as a MF Global director.  Fusco signed the shelf registration statement dated September

25, 2009 and the subsequent post-effective amendment filed with the SEC on February 24, 2010.

Fusco also signed MF Global's annual report on Form 10-K which was incorporated by

reference into the Public Offering Materials applicable to the Offerings.

30.     Defendant David Gelber ("Gelber") has been a member of the Board of Directors

of MF Global since 2010.  Gelber is liable for all Offerings completed during his tenure as a MF

11

Global director.  Gelber signed the post-effective amendment to the September 25, 2009 shelf registration statement.  The post-effect amendment was filed with the SEC on February 24, 2010. Gelber also signed MF Global's annual report on Form 10-K which was incorporated by reference into the Public Offering Materials applicable to the Offerings.

31.    Defendant Martin Glynn ("Glynn") has been a member of the Board of Directors of MF Global since 2008.  Glynn is liable for all Offerings completed during his tenure as a MF Global director.  Glynn signed the shelf registration statement dated September 25, 2009 and the subsequent post-effective amendment filed with the SEC on February 24, 2010.  Glynn also signed MF Global's annual report on Form 10-K which was incorporated by reference into the Public Offering Materials applicable to the Offerings.

32.    Defendant Edward L. Goldberg ("Goldberg") has been a member of the Board of Directors of MF Global since 2007.  Goldberg is liable for all Offerings completed during his tenure as a MF Global director.  Goldberg signed the shelf registration statement dated September 25, 2009 and the subsequent post-effective amendment filed with the SEC on February 24, 2010.  Goldberg also signed MF Global's annual report on Form 10-K which was incorporated by reference into the Public Offering Materials applicable to the Offerings.

33.    Defendant David I. Schamis ("Schamis") has been a member of the Board of Directors of MF Global since 2008.  Schamis is liable for all Offerings completed during his tenure as a MF Global director.  Schamis signed the shelf registration statement dated September 25, 2009 and the subsequent post-effective amendment filed with the SEC on February 24, 2010. Schamis also signed MF Global's annual report on Form 10-K which was incorporated by reference into the Public Offering Materials applicable to the Offerings.

12

34. Defendant Robert S. Sloan ("Sloan") has been a member of the Board of Directors of MF Global since 2007. Sloan is liable for all Offerings completed during his tenure as a MF Global director. Sloan signed the shelf registration statement dated September 25, 2009 and the subsequent post-effective amendment filed with the SEC on February 24, 2010. Sloan also signed MF Global's annual report on Form 10-K which was incorporated by reference into the Public Offering Materials applicable to the Offerings.

35. The individuals listed in ¶¶ 26-34 are referred to collectively herein as "Defendants."

## IV. RELEVANT NON-PARTY

36. MF Global is an interested party in this litigation and is not named as a Defendant because of the automatic bankruptcy stay provision pursuant to Section 362 of the United States Bankruptcy Code. However, as detailed herein, Defendants caused MF Global to issue untrue statements of material fact and omitted other facts necessary to make the statements not misleading in the Public Offering Materials in violation of Sections 11 and 12(a)(2) of the Securities Act.

## V. FACTUAL BACKGROUND

### A. Defendant Corzine Seeks To Transform MF Global Into A Full Service Investment Bank At All Costs

37. Prior to MF Global's Chapter 11 bankruptcy, the Company was one of the world's leading brokers in markets for commodities and listed derivatives. MF Global provided access to more than 70 exchanges globally and was a leader by volume on many of the world's largest derivatives exchanges. The Company also was an active broker-dealer in markets for commodities, fixed income securities, equities, and foreign exchange and was one of 20 primary dealers authorized to trade U.S. government securities with the Federal Reserve Bank of New

13

York.  The majority of the Company's revenues were derived from three main sources: (i) commissions generated from execution and clearing services; (ii) principal transactions revenue, generated both from client facilitation and proprietary activities; and (iii) net interest income from cash balances in client accounts maintained to meet margin requirements, as well as interest related to its collateralized financing arrangements and principal transactions activities.

38.     In March 2010, after a failed attempt at being reelected governor of the state of New Jersey, Defendant Corzine became the Chief Executive Officer of MF Global.  Although successful as a broker-dealer in markets for commodities and listed derivatives, Corzine sought to grow the Company into a global investment bank, akin to Goldman Sachs, where Corzine was the CEO from 1994 through 1999.  Indeed, on May 20, 2011, MF Global issued its annual report for its fiscal year 2011 on Form 10-K (the "2011 Form 10-K") in which the Company stated that "senior management introduced and began implementing a new strategic plan, which is intended to transform our business ultimately to a commodities and capital markets focused investment bank during the next three to five years."

39.     In connection with MF Global's "strategic plan," Corzine sought to have the Company increase its own proprietary trading by taking on riskier bets, including buying the debt of European countries like Italy, Spain, Belgium, Portugal and Ireland.  The 2011 Form 10-K reported that as of March 31, 2011, the Company held $6.3 billion in European sovereign debt. This was the first time that the Company publicly disclosed its enormous position in European sovereign debt.

40.     Although MF Global, led by Corzine and the other Defendants, recklessly invested billions of dollars in these highly risky securities, the Defendants caused the Company to consistently tout its risk management.  Indeed, in the 2011 Form 10-K, the Company stated

14

that it had a "global enterprise wide risk management framework that is intended to manage all aspects of our risks." MF Global further stated that its purported global "risk management framework" allowed the Company to "identify, assess, measure, monitor and limit market, credit and operational risks across our businesses."

41.     While the Company was assuring investors of its robust risk management processes and protocols, internally, Corzine was seeking to take on more risk in the pursuit of transforming MF Global into an international investment bank. According to a November 1, 2011 *New York Times* article, a trader at MF Global stated that Corzine was "instrumental in pushing our firm forward with risk taking in every book, whether it was U.S. government bonds, currencies, or in repos . . . . ***Everything was full throttle go***." [3] *The New York Times* further reported that investing in European sovereign debt was too tempting for Corzine given its yields of 2 to 3 percent and that "while most Wall Street firms sharply ratcheted down their use of leverage, MF Global continued to pile on large amounts of debt."

42.     In pursuit to make MF Global a powerful investment bank, Corzine and the other Defendants allowed the Company to increase their leverage to unsustainable levels. Prior to the Company filing for bankruptcy, it had approximately $34 of debt for each $1 capital it held, according to data from Keefe, Bruyette & Woods. By comparison, Goldman Sachs' leverage ratio at that time was $13.50 of debt for every $1 of capital.

43.     As discussed below, Corzine and the other Defendants knowingly jeopardized MF Global's liquidity and solvency by exposing it to European sovereign debt at a time when there was a European debt crisis severely affecting the economies of countries in the European Union.

---

[3] Unless otherwise stated herein, emphasis is added to certain quoted statements.

15

**B.**     **MF Global's Exposure To The European Debt Crisis**

44.     At the time the Defendants caused MF Global to invest billions of dollars to acquire highly risky European sovereign debt in connection with the Company's repurchase agreements, the Defendants knew how precarious the European debt and credit situation was given the numerous media reports and investor attention to the European debt crisis which adversely affected markets around the world.

45.     Seemingly everyday from the time MF Global first announced its enormous European sovereign debt holdings in May 2011 through the Company's ultimate bankruptcy in October 2011, there were news articles that reported on investors' deepening worries concerning the devaluation of European sovereign debt and whether certain European countries, including Italy, Spain, Portugal, Belgium and Ireland (the countries' debt that MF Global held), would default on their sovereign debt obligations.

46.     For example, *Bloomberg* reported in a June 20, 2011 article that "[w]orries over Europe's debt crisis kept markets on edge." At this time, investors were specifically concerned with Greece's ability to implement certain austerity measures to prevent defaulting on its debt. *Bloomberg* quoted a trader who noted that "[u]ntil markets see some solid plans put in place to deal with Greece, the markets are only going to be heading in one direction."

47.     On June 23, 2011, *The New York Times* quoted Ben S. Bernanke, chairman of the Federal Reserve, in connection with the risks of certain European countries defaulting on their debt.  Mr. Bernanke stated that "a disorderly default in one of those countries would no doubt roil financial markets globally.  It would have a big impact on credit spreads, on stock prices and so on.  And so in that respect *I think the effects in the United States would be quite significant." The New York Times* also noted that the five most "financially pressed European

16

Union countries" at that time were "Portugal, Italy, Ireland, Greece, and Spain." Tellingly, with the exception of Greece, MF Global's European sovereign debt holdings consisted of debt issued by all of these countries.

48.     *Bloomberg* also reported on June 23, 2011 that Jean-Claude Trichet, president of the European Central Bank, stated that the European debt crisis was threatening to infect banks. Specifically, Mr. Trichet "said risk signals for financial stability in the euro area are flashing 'red' as the debt crisis threatens to infect banks . . . the link between debt problems and banks 'is the most serious threat to financial stability in the European Union.'"

49.     A few weeks later, media outlets continued to report on the decline of global markets over concerns of the European debt crisis. On July 11, 2011, *The New York Times* reported that "stocks in the United States followed global markets lower on concerns about the euro zone debt crisis". The article quoted a research report prepared by Kevin H. Giddis, executive managing director for fixed income capital markets at Morgan Keegan & Company. In this report, Mr. Giddis highlighted the specific worries over Italy, stating that "[i]f Italy becomes more of a problem, then it could spiral out of control and cause the much-feared contagion that some have predicted. If that is the case, then a global economic slowdown will likely hit our shores here [in the United States] and take the legs out of an already wounded U.S. economy."

50.     One week later, on July 18, 2011, *The New York Times* reported on the growing problem that European banks were having with its holdings of European sovereign debt. After certain European banks undertook "stress tests," the results "revealed in greater detail . . . just how exposed Europe's banks are to the government bonds of Greece, Portugal, Spain, and Italy, *which are losing more value daily*." *The New York Times* reported that while these stress tests

17

did not factor in a Greek default, "the more immediate concern could be the effect on bank balance sheets as their sovereign bond holdings – *especially in the case of widely held Italian debt – continue to lose value in the bond market sell-off* . . . . as the crisis worsens, it may well be the case that today's capital cushion will not be enough to cover tomorrow's sovereign bond losses."

51.     Incredibly, MF Global voluntarily put itself in the same shoes as certain European banks -- only the Company voluntarily took positions in European sovereign debt *after* the crisis had begun.  The above article demonstrates how the same government bonds that MF Global held continued to lose value over the summer months of 2011 which raised capital concerns for many European banks.  The same bonds lost value in MF Global's European sovereign debt holdings which increased liquidity and working capital pressures on the Company.  Despite these heightened risks, the Company *increased* its holdings of European sovereign debt as it reported in its fiscal first quarter 2012 Form 10-Q, where MF Global disclosed that it held $6.4 billion notional amount of European sovereign debt as of June 30, 2011.

52.     Investors' worries concerning how the European debt crisis would affect undercapitalized banks did not cease with the passage of the European Financial Stability Facility.  As reported in an August 3, 2011 *New York Times* article:  "[T]he European Financial Stability Facility, Europe's so-called bazooka rescue fund that it endowed last month with the powers to recapitalize weak banks, will not be able to offer any such aid for at least two months . . . . At that point, it must be approved by the parliaments of the 17 countries that use the euro currency.  Only then could it go to the market and raise funds to help a bank in need.  That may well be too late."  Indeed, during this time, European sovereign debt continued to decline in value as investors fled the market and unwound positions tied to these securities. *Bloomberg*

18

quoted an analyst on August 5, 2011 who wrote that "[i]ncreasingly violent moves in stressed [European] sovereign bonds, bank equity values and now all traded markets are driving a self-perpetuating downward spiral."

53.     Throughout the months of August and September, market concerns over the spread of the European debt crisis into other European Union countries grew.  *The New York Times* reported on August 11, 2011 that "as Europe's debt crisis has spread into nations at the heart of the euro zone like Italy and France, it has added a new level of anxiety to markets." Similarly, the *New York Times* reported on September 2 and 5, 2011 that Europe's central bank began "the extraordinary step of buying Italian and Spanish debt" as there was "no genuine investor demand for Spanish and Italian government bonds."  Overall, "[b]etween Europe's sovereign debtors, its banks and its currency, there is a credible systemic threat . . . no one has come up with a comprehensive plan to right the European financial ship."

54.     Indeed, the European debt crisis was and continues to affect markets around the world and not just those in the European Union.  As *The Wall Street Journal* reported on September 23, 2011, the "[s]overeign debt woes rocking world financial markets are a global phenomenon and not just a European one . . . risks to global financial stability have risen since June [2011] as tensions stemming from the high levels of debt and deficit of some euro area countries have spread through capital markets."

55.     As the European debt crisis escalated during 2011, threatening the sovereign debt yields and borrowing costs of many European Union countries and in particular Italy, Spain, Portugal, Ireland and Belgium, Corzine and the other Defendants blindly continued to push MF Global into more risky proprietary trading, including its repurchase transactions tied to European sovereign debt.

19

C.   **The Public Offering Materials Materially Misstate And Omit Material Facts Concerning The Adequacy Of MF Global's Risk Management, Liquidity And Internal Controls**

56.    Despite the much publicized European debt crisis, including the enormous risks associated with investing in European sovereign debt, the Public Offering Materials touted MF Global's purported "effective risk management" and robust liquidity and working capital.

57.    For example, in the Company's 2011 Form 10-K, MF Global stated that its "effective risk management" was "critical to the success" of its business and highlighted the Company's established "global enterprise wide risk management framework." Moreover, the 2011 Form 10-K stated that "[s]enior management takes an active role in the risk management process" and that MF Global sought to "identify, assess, measure, monitor and limit market, credit and operational risks" across all of its businesses.

58.    Similar statements were made in MF Global's annual proxy statement that it sent to its shareholders in connection with the Company's annual shareholders meeting. The proxy statement highlighted the duties and responsibilities of MF Global's board of directors, which included overseeing the Company's risk management processes and determining its "risk appetite." The proxy statement noted that the Company's risk management "involves a strong governance structure that clearly defines responsibilities, delegated authorities for risk control as well as risk-taking and documented policies designed to identify, measure, control and mitigate risk."

59.    As detailed herein, MF Global continued to make untrue statements concerning its risk management in its fiscal first quarter 2012 Form 10-Q. Again touting the Company's "comprehensive risk governance structure and management processes," the quarterly report stated that the Company "maintain[ed] risk within acceptable risk tolerances" and that MF

20

Global established risk "limits for each of its businesses based on its risk appetite" so that each business area has primary responsibility for risk management "by balancing their ability to profit from revenue-generating activities with their exposure to potential losses."

60. MF Global consistently made materially false and misleading statements concerning its risk management processes and protocols, which purportedly allowed the Company to "effectively" evaluate, manage, and mitigate risks in all of its businesses. In reality, however, MF Global had inadequate internal and risk controls to allow the Company to properly assess the enormous amount of risk it had based on its exposure to billions of dollars of European sovereign debt. Moreover, the Defendants, led by Corzine, caused the Company to hide its true risk-taking activities by materially reducing its short-term borrowing each quarter shortly before reporting its quarterly results.

61. MF Global also misled investors about its liquidity and working capital in the Public Offering Materials. In MF Global's 2011 Form 10-K and its fiscal first quarter 2012 Form 10-Q, the Company touted its liquidity stating that it had "multiple sources of liquidity," including a $1.2 billion credit facility and "excess capital" available in its subsidiaries. Moreover, in both of these SEC filings, the Company stated that it had "sufficient liquidity" to meet its obligations over the next year. Incredibly, MF Global further stated in both the 2011 Form 10-K and first quarter 2012 Form 10-Q that "*as a matter of policy, the Company maintains excess capital to provide liquidity during periods of unusual market volatility.*"

62. As detailed further below, these statements concerning the adequacy of MF Global's liquidity and working capital were materially false and misleading and omitted material facts as the Company was suffering from severe liquidity pressures in connection with its exposure to European sovereign debt. Moreover, Defendants disregarded MF Global's liquidity

21

risk and inadequate liquidity to cover margin calls from the counterparties to the repurchase agreements. These counterparties demanded more capital from MF Global as the value of its European sovereign debt holdings continued to plummet in value throughout 2011.

63.    Given the severe liquidity pressures that only continued to get worse over the summer months of 2011, MF Global failed to comply with certain regulatory capital requirements, despite making untrue statements in the 2011 Form 10-K and first quarter 2012 Form 10-Q that its U.S. broker-dealer subsidiary was "in compliance" with such requirements. As detailed below, Plaintiff and other Class Members first learned of the Company's noncompliance on September 1, 2011 – one month *after* the Offerings.

### D.    MF Global Sustains A Net Capital Deficit In Connection With Its European Sovereign Debt Holdings

64.    Unbeknownst to investors, including Plaintiff and other Class Members that purchased the Bond Class Securities in the Offerings, in July 2011, the Company failed to maintain sufficient capital to support its off-balance sheet exposure to European sovereign debt that was used as collateral in the Company's repurchase transactions.

65.    According to a November 2, 2011 *Reuters* article, U.S. regulators, including FINRA, started to raise concerns about MF Global's European sovereign debt position as early as June 2011 – *two months prior* to the Offerings and four months prior to the Company's collapse into bankruptcy.

66.    Specifically the *Reuters* article reported:

> *Around June, [FINRA], one of many regulators that policed [MF Global], became concerned that MF Global had a substantial position in European sovereign debt and was not appropriately holding capital against it . . . FINRA began conversations with MF Global about whether it was appropriate under Generally Accepted Accounting Principles to consider the exposure to be off balance sheet . . . FINRA felt that regardless*

22

> *of [Generally Accepted Accounting Principles ("GAAP")], MF*
> *Global should recognize how much the market value of the*
> *sovereign debt-related holdings had declined, and consulted the*
> *[SEC].*

Tellingly, neither MF Global nor any of the Defendants publicly disclosed prior to the Offerings

that the Company needed to infuse additional capital to support its approximately $6.3 billion

position in European sovereign debt.

      67.    On October 17, 2011, *The Wall Street Journal* reported that MF Global was

suffering from a deficit of approximately $150 million in "excess net capital" for the month of

July due to its European sovereign debt holdings.  Given this deficiency, the Company was not in

compliance with SEC Rule 15c3-1.  After months of discussions with FINRA and the SEC, MF

Global had no other choice but to allocate more capital to make up the approximately $150

million deficiency resulting from its European sovereign debt holdings.

      68.    Despite this material event, MF Global did not disclose its failure to comply with

SEC Rule 15c3-1 until September 1, 2011 – approximately one month after the Company

completed the Offerings in which it obtained $650 million in needed capital from Plaintiff and

other Class Members.  On that day, MF Global amended its First Quarter 2012 Form 10-Q and

stated that it "was recently informed by the Financial Industry Regulatory Authority, or FINRA,

that its regulated U.S. operating subsidiary, MF Global Inc., is required to modify its capital

treatment of certain repurchase transactions to maturity collateralized with European sovereign

debt and thus increase its required net capital pursuant to SEC Rule 15c3-1."  The Company

further stated that it had increased its net capital and at that time had "net capital sufficient to

exceed both the required minimum level and FINRA's early-warning notification level."

      69.    Less than two months later, MF Global could no longer hide its precarious

liquidity and working capital exposure as its European sovereign debt holding continued to lose

23

value, raising margin calls and other collateral calls by counterparties to the repurchase transactions. The counterparties sought to protect themselves from the plummeting values of MF Global's European sovereign debt used as collateral to these repurchase transactions.

71. 70. Because of MF Global's desperate need for liquidity and working capital to cover these margin calls and other cash demands from its clients, the Defendants caused the Company to misappropriate over a billion dollars of *client money* in an effort to avoid MF Global's demise. As investors would soon learn, the Company's unsustainable risk-taking forced MF Global into bankruptcy.

### E.   MF Global's Downfall

71. On October 24, 2011, Moody's downgraded MF Global's long-term ratings from "Baa2" to "Baa3," or one notch above junk status. Moody's provided a rationale for the downgrade, citing the fact that "the current low interest environment and volatile capital markets conditions make it unlikely that MF Global, in the near term, will be able to achieve the financial targets that Moody's had previously specified were required for it to maintain a Baa2 rating." Additionally, Moody's stated that "MF Global's increased exposure to European sovereign debt in peripheral countries and its need to inject capital into its broker-dealer subsidiary to rectify a regulatory capital shortfall highlights the firm's increased risk appetite and raises questions about the firm's risk governance . . . . These issues will be a key consideration during Moody's review of MF Global for possible further downgrade."

72. On this news, the value of the Company's 3.375% Notes declined in value by 21.625% from 69.75% on October 24, 2011 to 48.125% on October 25, 2011. The Company's 6.25% Notes declined in value by 23.65% from 87.4% on October 24, 2011 to 63.75% on October 25, 2011.

24

73.     On October 25, 2011, MF Global reported its largest-ever quarterly loss, with a net loss of $191.6 million, or $1.16 per diluted share, for the Company's second fiscal quarter ended September 30, 2011. The Company also had a net revenue loss of $205.9 million, a 14.3% decline compared to the same period in the prior year. In connection with the Company's European sovereign debt holdings, Defendant Corzine falsely stated that "over the course of the past year, we have seen opportunities in short-dated European sovereign credit markets and built a fully financed, laddered maturity portfolio that we actively manage. We remain confident that we have the resources and expertise to continue to successfully manage these exposures to what we believe will be a positive conclusion in December 2012." At the time Corzine made these false statements, he and the other Defendants knew that the Company was facing margin calls from certain of its counterparties in the repurchase agreements collateralized by European sovereign debt as those assets were dwindling in value.

74.     On October 27, 2011, *Bloomberg* reported that by October 26, MF Global had completely exhausted its $1.3 billion credit facility. Although the Company had touted its liquidity position in the Public Offering Materials, Plaintiff and other Class Members learned for the first time that these statements were untrue as MF Global was in desperate need of working capital to stave off margin calls and other cash demands from the counterparties to the repurchase agreements backed by the European sovereign debt and from its large clients seeking to liquidate their accounts.

75.     Additionally, on October 27, 2011 both Moody's and Fitch further downgraded the Company's credit rating to junk status. Fitch stated that MF Global's "increased risk taking activities have resulted in sizeable concentrated positions [in European sovereign debt] relative to the firm's capital base, leaving MF [Global] vulnerable to potential credit deterioration and/or

25

significant margin calls." Moody's stated that its downgrade from Baa3 to Ba2 reflected the fact

that "MF Global's weak core profitability contributed to it taking on substantial risk in the form

of its exposure to European sovereign debt in peripheral countries. At the end of the second

quarter, MF Global's $6.3 billion sovereign risk exposure represented 5 times the company's

tangible common equity." A senior analyst at Moody's further stated that the "tactical decision

to assume this outsized proprietary position, highlights the core profitability challenges faced by

MF Global and the scope of the re-engineering challenge facing the firm's management."

Moody's also noted its belief "*that the risk appetite revealed by this position, in tandem with*

*the significant quarterly loss that MF Global reported, subjects the firm to a heightened risk of*

*loss of client and counterparty confidence -- and could thus further challenge the company's*

*franchise*."

76.     On this news, the value of the Company's 3.375% Notes declined in value by 7%

from 55.0% on October 27, 2011 to 48.0 % on October 28, 2011. The Company's 6.25% Notes

declined in value by 15% from 65.0% on October 26, 2007 to 50% on October 28, 2011.

77.     Over the next few days, from October 28 through October 30, 2011, MF Global

worked with Evercore Partners Inc. in exploring options of selling part of the Company,

including its U.S. broker-dealer subsidiary, and other strategic options to avoid bankruptcy. MF

Global also contacted Blackrock Inc. to help it wind down its balance sheet, including efforts to

sell its holdings of European sovereign debt. According to a November 2, 2011 *New York Times*

article, two main bidders quickly emerged as being interested in buying part of MF Global – the

Interactive Brokers Group and Jeffries Group.

78.     Reportedly, after reviewing MF Global's books on October 28 and 29,

representatives of the Jefferies Group left MF Global's headquarters without making a bid. *The*

*New York Times* reported that just before 1:45 a.m. on Monday, October 31, as representatives from the Interactive Brokers Group were going through MF Global's books, "Corzine received the information telling him that customer funds were missing. That alarmed Interactive Brokers, and the firm walked away from the bargaining table."

79.     Later that day on October 31, 2011, MF Global filed for Chapter 11 protection in the United States Bankruptcy Court for the Southern District of New York. On November 1, 2011, the New York Stock Exchange suspended trading in the Company's shares and moved to de-list MF Global altogether.

80.     On November 1, 2011, media outlets reported that there were hundreds of millions of dollars missing in MF Global's client funds. *The Wall Street Journal* reported that as a result of the hundreds of millions of dollars missing from MF Global's client accounts, the CFTC had voted to issue subpoenas to MF Global and the FBI planned to conduct a formal investigation into what happened to the missing money. Additionally, the SEC and CME Group were also conducting investigations to see whether the Company committed serious violations of federal rules and regulations governing the proper maintenance and segregation of client money. These investigations are all ongoing and will likely provide more information concerning when and how the Defendants caused the Company to improperly divert client money to support its own risky and principal transactions, including investments in European sovereign debt.

81.     On November 4, 2011, *The Wall Street Journal* reported that MF Global may have disguised its debt levels to investors over the past two years by temporarily slashing its short-term borrowings just before publicly reporting its quarterly results, an activity referred to as "window dressing." *The Wall Street Journal* stated: "[i]n each of the past seven quarters from late 2009 through mid-2011, MF Global's quarter-end borrowings were on average 16%

27

lower than the quarterly average." By temporarily slashing its short-term debt borrowings, the

Company was hiding its "true levels of borrowing and risk-taking." As *The Wall Street Journal*

explained:

> For example, in 2010's third quarter, MF [Global's] short-term
> borrowings were listed as $18.7 billion when it reported to
> shareholders. During the quarter, however, those borrowings
> peaked at $28.4 billion – 34% higher – and averaged $24.4 billion
> during the three-month period, according to Journal analysis.
> Short-term borrowing typically pumps up risk-taking, allowing
> banks to make bigger trading bets.
>
> Window dressing isn't illegal, but it can mask a financial
> institution's true levels of borrowing and risk-taking. That is an
> issue of particular concern with MF Global, where borrowings
> fueled large trades on European sovereign debt that helped lead to
> the firm's demise.

82.     On November 4, 2011, Corzine resigned as Chairman and CEO of MF Global.

Reportedly, Corzine has hired a defense attorney in wake of MF Global's demise and the

likelihood of facing multiple lawsuits and investigation inquiries from U.S. regulators

concerning the facts and circumstances detailed herein that led to the Company's bankruptcy.

83.     On November 21, 2011, numerous media outlets including *Bloomberg*, *The Wall

Street Journal*, and *The New York Times* reported that the bankruptcy court-appointed trustee

overseeing the liquidation of MF Global's U.S. broker-dealer subsidiary estimated that the

shortfall in the MF Global's customer funds ***could be more than $1.2 billion***, doubling previous

estimates. *The New York Times* stated that: "[r]egulators currently suspect that MF Global

improperly used customer money for its own purposes in the days before filing for Chapter 11

protection, according to people briefed on the matter . . . . Authorities are still searching for the

money, and are considering two possibilities. One is that MF Global used the money to meet

28

trading partners' demands for extra cash, which could come back. The other is that it was used to cover trading losses, which would be unrecoverable."

84.     In the weeks following MF Global's October 31, 2011 Chapter 11 bankruptcy filing, the Company's 3.375% Notes and 6.250% Notes have continued to decline in value. By mid-November 2011, both Notes were trading in the mid-30% of the Notes 100% par value at the time of the Offerings. Accordingly, both Notes have lost approximately 65% of their value.

85.     Currently, numerous federal regulators and agencies have commenced and/or are continuing their investigations into the "missing" client money, including the SEC, the FBI, the CFTC and the U.S. Department of Justice ("DOJ"). In addition, on December 3, 2011, *The New York Times* reported that the U.S. House of Representatives Agriculture Committee voted unanimously to force Defendant Corzine to appear at a hearing on December 8, 2011 to face questioning regarding the collapse of the Company. The investigations are ongoing and likely will provide more information over the coming months concerning the vast sum of client money that is currently unaccounted for.

## VI.   DEFENDANTS' VIOLATIONS OF SECTIONS 11 AND 15 OF THE SECURITIES ACT

### A.     Materially False And Misleading Statements And Omissions Of Material Fact In The Securities Offerings

86.     The Securities Act claims are brought on behalf of investors who purchased MF Global securities in or traceable to the Offerings, each of which was conducted pursuant to a Shelf Registration Statement and Prospectus, filed with the SEC on Form S-3 on September 25, 2009 (as amended through a subsequent post-effective amendment filed with the SEC on February 24, 2010) (collectively, the "Shelf Registration Statement"). The "effective date" for the Shelf Registration Statement, as that term is defined under the Securities Act, is the date of

29

the relevant Offering, not the earlier date on which the Shelf Registration Statement itself was

filed. *See* 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

87. The Form S-3 "shelf registration" permits an issuer to register numerous different

securities for later issuance in a single SEC filing. Once this "shelf" is established, the issuer

may later "take down" securities from the shelf by issuing them to the public pursuant to a later-

filed prospectus, prospectus supplement, and/or pricing supplement that refers investors to the

underlying Form S-3. Accordingly, each of the Offerings was also conducted pursuant to its

own prospectus, prospectus supplement, and/or pricing supplement.

88. The Shelf Registration Statement also expressly incorporated by reference certain

of MF Global's Forms 10-K, 10-Q, and 8-K filed with the SEC prior to the date of each of the

Offerings. Additionally, the Shelf Registration Statement contained the following language:

> The SEC's rules allow us to "incorporate by reference"
> information into this prospectus. This means that we can disclose
> important information to you by referring you to another
> document. Any information referred to in this way is considered
> part of this prospectus from the date we file that document. Any
> reports filed by us with the SEC after the date of this prospectus
> and before the date that the offering of the securities by means of
> this prospectus is terminated will automatically update and, where
> applicable, supersede any information contained in this prospectus
> or incorporated by reference in this prospectus . . . .
>
> All documents filed by us under Sections 13(a), 13(c), 14 or 15(d)
> of the Securities Exchange Act of 1934 on or after the date of this
> prospectus and before the termination of the applicable offering.

89. Additionally, the prospectus supplement for each of the Offerings also expressly

incorporated by reference certain SEC filings, including certain Forms 10-K, 10-Q, and 8-K as

well as a Schedule 14A Definitive Proxy Statement. As set forth herein, MF Global's Forms 10-

30

K, 10-Q, and 8-K, and its Proxy Statement made materially false and misleading statements of fact and omitted material facts.

90.     For each Offering, the Shelf Registration Statement, the prospectus, and prospectus supplement for that Offering, and all SEC filings incorporated therein are referred to collectively as the "Public Offering Materials." The particular SEC filings incorporated into the Public Offerings Materials for each Offering are set forth below, along with the date of the particular offering, description of the security (with the "CUSIP" number, which is a standard way investors identify particular securities), and the dollar value of the particular Offering:

| Date of Offering | Security Description (CUSIP Number) | Value of Security Sold to Investing Public | Specific SEC Filings Incorporated by Reference |
|---|---|---|---|
| July 28, 2011 (the "July 28, 2011 Offering") | 3.375% Notes due August 1, 2018 (55277JAB4) | $325,000,000 | • Annual Report on Form 10-K for the fiscal year ended March 31, 2011, filed on May 20, 2011; <br>• Current Reports on Form 8-K filed on June 17 and July 28, 2011; and <br>• Definitive Proxy Statement on Schedule 14A for Annual Shareholders Meeting filed on July 7, 2011 |
| August 3, 2011 (the "August 3, 2011 Offering") | 6.250% Notes due August 8, 2016 (55277JAC2) | $325,000,000 | • Annual Report on Form 10-K for the fiscal year ended March 31, 2011, filed on May 20, 2011; <br>• Current Reports on Form 8-K filed on June 17, July 28, and August 3, 2011; <br>• Definitive Proxy Statement on Schedule 14A for Annual Shareholders Meeting filed on July 7, 2011; and |

EC.47081.3

| | | | • Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2011, filed on August 3, 2011 |
|---|---|---|---|

91.     In connection with the July 28, 2011 Offering, MF Global filed a prospectus

supplement dated July 28, 2011 (the "July 28, 2011 Prospectus Supplement") with the SEC on

August 1, 2011. On August 3, 2011, the Company filed a Form 8-K stating that on August 2,

2011, the Company completed its July 28, 2011 Offering of $325 million principal amount of its

3.375% Convertible Senior Notes due 2018.

92.     Similarly, in connection with the August 3, 2011 Offering, MF Global filed a

prospectus supplement dated August 3, 2011 (the "August 3, 2011 Prospectus Supplement") with

the SEC on August 4, 2011. On August 9, 2011, the Company filed a Form 8-K stating that on

August 8, 2011, the Company completed its August 3, 2011 Offering of $325 million principal

amount of its 6.250% Senior Notes due 2016.

93.     Both the July 28, 2011 Prospectus Supplement and the August 3, 2011 Prospectus

Supplement contained materially false and misleading statements and omitted to disclose

material facts concerning the purported "use of proceeds" from each Offering.

94.     For example, the July 28, 2011 Prospectus Supplement stated, under a section

titled "Use of Proceeds," that MF Global estimated it would receive $315.4 million in net

proceeds from the July 28, 2011 Offering, "after deducting underwriting discounts and

commissions and estimated offering expenses." The July 28, 2011 Prospectus Supplement

further stated:

> We intend to use approximately $25.2 million of the net proceeds
> from this offering to fund the cost of entering into the convertible
> note hedge transactions . . . . In addition, we expect to repurchase
> approximately $109.1 million of our outstanding 2038 Convertible

32

Senior Notes from a limited number of holders of such notes in privately-negotiated transactions, which will be conditioned upon the closing of this offering.  We intend to use approximately $130.6 million of the net proceeds from this offering to complete such repurchases and to pay all fees and expenses in connection therewith.  *We intend to use any remaining net proceeds from this offering for general corporate purposes* and may use a portion of the remaining net proceeds to repay amounts outstanding under our $1.2 billion unsecured, committed revolving credit facility, which we refer to as our liquidity facility.

95.     The August 3, 2011 Prospectus Supplement stated, under a section titled "Use of Proceeds," that MF Global estimated it would receive $319.7 million in net proceeds from the August 3, 2011 Offering, "after deducting underwriting discounts and commissions and estimated offering expenses."  The August 3, 2011 Prospectus Supplement further stated:

We intend to use at least $100 million of the net proceeds from this offering to repay outstanding indebtedness under our $1.2 billion unsecured, committed revolving credit facility, which we refer to as our liquidity facility.  *We expect to use the remainder of the net proceeds for general corporate purposes, including, without limitation, as working capital for our broker-dealer subsidiaries.*

96.     The July 28, 2011 Prospectus Supplement and the August 3, 2011 Prospectus Supplement were materially false and misleading and omitted material facts required to make the statements not misleading.  Far from just using the net proceeds from the Offerings for "general corporate purposes," Defendants knew that the majority of net proceeds were needed to provide desperately required liquidity and working capital given the then-deterioration of the approximately $6.4 billion invested in European sovereign debt.  As a result of the devaluation of these securities, MF Global was facing mounting margin calls and other cash demands from counterparties to the repurchase transactions which were collateralized by the European sovereign debt.  In fact, as first disclosed by *The Wall Street Journal* on October 17, 2011, in

33

July 2011, Defendants knew that the Company had a net *deficit* of approximately $150 million in required net capital for "certain repurchase transactions" that were backed by European sovereign debt.  FINRA required MF Global to add capital to make up for this deficit in or around the time that the Company received the net proceeds from the two Offerings.

**B.    Materially False And Misleading Statements And Omissions Of Material Fact In The Documents Incorporated By Reference**

97.    As further detailed above, the Public Offering Materials pursuant to which MF Global conducted the above Offerings incorporated certain of the Company's SEC filings, which in turn set forth materially false and misleading statements, and failed to disclose material facts, beginning with the Company's Form 10-K for its fiscal year 2011, filed on May 20, 2011.

**1.    2011 Form 10-K**

98.    On May 20, 2011, MF Global filed with the SEC its Form 10-K announcing its financial results for its fiscal year 2011 (the "2011 Form 10-K").  This is was the first public filing in which Defendants caused the Company to disclose that it held $6.3 billion in European sovereign debt "issued by a group of western European countries, consisting of Italy, Spain, Belgium, Portugal and Ireland, which have a weighted average maturity of April 2012 and a final maturity of December 2012."

99.    Given this highly risky position, Defendants caused MF Global to make numerous materially false and misleading statements in the 2011 Form 10-K concerning the Company's: (i) ability to effectively and responsibly manage risk; (ii) adequate liquidity; and (iii) internal controls.

34

a.    **Materially False and Misleading Statements and Omissions of Material Fact Concerning MF Global's Risk Management Protocols and Processes**

100.    In its 2011 Form 10-K, MF Global touted its "effective risk management" as a key reason for the success of the Company's business and it general ability to adequately assess and manage the risk that MF Global was exposed to in its businesses.  In particular, MF Global stated:

> We believe that effective risk management is critical to the success of our business and is the responsibility of all of our employees . . . *we have established — and continue to evolve and improve — a global enterprise wide risk management framework that is intended to manage all aspects of our risks.  The risk-management framework is designed to establish a global, robust risk-management environment through a strong governance structure that (i) defines roles and responsibilities, (ii) delegates authority for risk control and risk taking to specific businesses and risk managers, and (iii) documents approved methodologies for the identification, measurement, control and mitigation of risk.*
>
> *We seek to identify, assess, measure, monitor and limit market, credit and operational risks across our businesses.*

101.    The 2011 Form 10-K also indicated that MF Global's senior management allegedly took an active role in monitoring and overseeing the Company's risk management processes:

> *Our Chief Risk Officer, who reports to our President and Chief Operating Officer, leads the risk department and monitors and reports on our risk matters, including regular reports to our Board of Directors and Audit and Risk Committee.  The Chief Risk Officer promotes company-wide adherence to MF Global's enterprise risk management framework and has global responsibility for monitoring and facilitating control of market, credit and operational risks.*

35

> *Senior management takes an active role in the risk management*
> *process* and expects employees to understand and comply with
> their delegated risk responsibilities, relevant risk policies, and
> compliance requirements.

102.    As part of MF Global's purported effective risk management, the 2011 Form 10-

K explained how the Company's risk management protocols facilitated the Company's risk

reporting process:

> Reports detail global risk exposures and escalate risks that exceed
> defined thresholds. *Our risk reporting process is designed to*
> *enable us to assess the levels of risk present throughout our*
> *operating environment and to take any necessary remedial action*
> *in a timely manner. As part of this reporting process, risk reports*
> *detailing global risk exposures and escalating risks that exceed*
> *defined thresholds are regularly generated.*
>
>         *                *                *
>
> *We have a comprehensive risk governance structure and*
> *management processes designed to monitor, evaluate, and*
> *manage the risks we assume in conducting our business.* The
> principal risks we face include market risk (within which we
> include issuer default risk), credit risk, capital risk, liquidity risk
> and operational risk.

103.    MF Global defined "market risk" as "the risk of loss due to changes in the value

of financial instruments, positions and investments resulting from fluctuations in the level of

market factors." A part of MF Global's market risk involved its exposure to "the credit

worthiness of the issuer," including the specific European countries that issued the sovereign

debt that collateralized MF Global's repurchase agreements. The Company stated that it was

"exposed to market risk from our principal activities, including, market making, client

facilitation and, proprietary activities, other company investments, and treasury operations. Our

treasury and other company investments include those made for cash and asset liability

management, including held-to-maturity investments and repo-to-maturity transactions."

36

104.    To protect itself from these exposures to market risk, MF Global explained in the 2011 Form 10-K that "[w]e manage these exposures by limiting the size and concentration of positions held in accordance with our risk appetite and the delegated authorities, both approved by the Board . . . . Positions are monitored and reviewed intra-day, where appropriate, and end-of-day to identify any accounts trading beyond pre-set limits and parameters.  Escalations are made and actions are taken in line with our policy."

105.    These above statements concerning MF Global's ability to effectively manage, assess, and evaluate risk, including market risk from its own proprietary trading, were materially false and misleading and omitted material facts required to make the statements not misleading. At the time Defendants caused MF Global to make these statements in the 2011 Form 10-K:

a.      The Defendants, led by Corzine, completely disregarded the Company's purported risk management protocols in their aggressive pursuit to transform MF Global from a broker-dealer into a full-service investment bank and to increase its proprietary trading by recklessly investing in billions of dollars of European sovereign debt risking the Company's solvency;

b.      MF Global's risk management protocols and processes failed to adequately assess risk in its own proprietary trading, including MF Global's exposure to billions of dollars of European sovereign debt; and

c.      MF Global was hiding its true risk-taking activities by materially reducing its short-term borrowing each quarter shortly before reporting its quarterly results.

**b.      Materially False and Misleading Statements and Omissions of Material Fact Concerning the Adequacy of MF Global's Liquidity and Working Capital**

106.    Besides making material misrepresentations and omissions concerning MF Global's risk management processes, Defendants also caused the Company to disseminate materially false and misleading statements concerning the adequacy of MF Global's liquidity.

37

107.    For example, the 2011 Form 10-K assured investors of MF Global's "multiple sources of liquidity," stating:

> *We have multiple sources of liquidity.  We expect our primary liquidity needs over the next 12 months to be for working capital, debt service obligations and preferred dividend obligations.* Subject to the discussion below regarding our changing liquidity needs as a result of the implementation of our strategic plan, *we believe we will have sufficient liquidity to meet these obligations given our expected cash flows from operations and our available sources of liquidity.*

108.    In touting its liquidity position, MF Global reported that it had different sources of liquidity, including a $1.2 billion "liquidity facility," of which only $367 million had been used as of March 31, 2011, and the availability of "excess capital in our regulated subsidiaries . . . excess cash held in the bank accounts of non-regulated subsidiaries . . . [and] customer collateral."  Additionally, the 2011 Form 10-K stated that "*[w]e believe that our current working capital is more than sufficient for our present requirements.*"

109.    Defendants also assured investors in the 2011 Form 10-K that "*as a matter of policy, we maintain excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events.*"

110.    Finally, in connection with MF Global's purported ability to manage liquidity risk, the 2011 Form 10K stated that the Company's "policy requires us to have sufficient liquidity to satisfy all of our expected cash needs for at least one year without access to the capital markets . . . . To manage our liquidity risk, we have established a liquidity policy designed to ensure that we maintain access to sufficient, readily available liquid assets and committed liquidity facilities."

38

111.    These above statements concerning MF Global's liquidity and working capital

were materially false and misleading and omitted material facts required to make the statements

not misleading.  At the time Defendants caused MF Global to make these statements in the 2011

Form 10-K:

    a.      Defendants completely disregarded MF Global's liquidity risk and its
            insufficient liquidity and working capital to support the then-devaluation
            of billions of dollars of European sovereign debt held by the Company;

    b.      MF Global was suffering from severe liquidity pressures based on its
            exposure to the European debt crisis through its enormous holdings of
            European sovereign debt; and

    c.      MF Global was materially undercapitalized.

            **c.      Materially False and Misleading Statements and Omissions of
                      Material Fact Concerning MF Global's Internal Controls**

112.    Defendants claimed in the 2011 Form 10-K that MF Global had effective internal

controls over financial reporting, stating:

        Management of MF Global Holdings Ltd. together with its
        consolidated subsidiaries (the "Company"), is responsible for
        establishing and maintaining adequate internal control over
        financial reporting.

        The Company's internal control over financial reporting is a
        process designed under the supervision of the Company's principal
        executive and principal financial officers to provide reasonable
        assurance regarding the reliability of financial reporting and the
        preparation of the Company's consolidated financial statements for
        external reporting purposes in accordance with accounting
        principles generally accepted in the United States of America.

                    *           *           *

        Management conducted an assessment of the effectiveness of the
        Company's internal control over financial reporting as of
        March 31, 2011 based on the framework established in *Internal*

                                    39

*Control -- Integrated Framework* issued by the Committee of
Sponsoring Organizations of the Treadway Commission. Based on
this assessment, management has determined that the Company's
internal control over financial reporting as of March 31, 2011 was
effective and that there were no material weaknesses in the
Company's internal control over financial reporting as of that date.

113.    The 2011 Form 10-K also included certifications signed by Defendants Corzine

and Steenkamp pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which represented

that the Company's financial statements did not contain material misstatements or omissions,

and that the Company employed internal disclosure controls over financial reporting and related

disclosures.

114.    In this regard, the 2011 Form 10-K contained a certification signed by Defendant

Corzine, which stated:

> I, Jon S. Corzine, certify that:
>
> 1.      I have reviewed this Annual Report on Form 10-K
> for the fiscal year ended March 31, 2011 of MF Global Holdings
> Ltd.;
>
> 2.      Based on my knowledge, this report does not
> contain any untrue statement of material fact or omit to state a
> material fact necessary to make the statements made, in light of the
> circumstances under which such statements were made, not
> misleading with respect to the period covered by this report;
>
> 3.      Based on my knowledge, the financial statements,
> and other financial information included in this report, fairly
> present in all material respects the financial condition, results of
> operations and cash flows of the Registrant as of, and for, the
> periods presented in this report;
>
> \*            \*            \*
>
> 5.      The Registrant's other certifying officer and I have
> disclosed, based on our most recent evaluation of internal control
> over financial reporting, to the Registrant's auditors and the audit

40

committee of the Registrant's board of directors (or persons performing the equivalent functions):

      a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

      b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

115.    The 2011 Form 10-K contained a separate certification signed by Defendant Steenkamp, which contained a verbatim reproduction of Defendant Corzine's certification statements above.

116.    Moreover, the 2011 Form 10-K contained certifications signed by Defendant Corzine, which stated in pertinent part that:

In connection with the Annual Report of MF Global Holdings Ltd. . . . on Form 10-K for the fiscal year ended March 31, 2011 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Jon S. Corzine, Chief Executive Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that:

1.    the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

117.    The 2011 Form 10-K also contained an identical certification pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed by Defendant Steenkamp.

118.    The above certifications and statements concerning MF Global's internal controls and the accuracy and completeness of the 2011 Form 10-K were materially false and misleading

41

and omitted material facts required to make the statements not misleading because MF Global's internal controls were ignored and/or severely deficient and, thus, allowed the Company to: (i) invest $6.3 billion in highly risky European sovereign debt that was deteriorating in value; (ii) understate liquidity and necessary working capital based upon its exposure to the devaluation of the European sovereign debt; and (iii) hide the true risks that its exposure to the European sovereign debt had on the financial viability of the Company.

## 2.   July 7, 2011 Definitive Proxy Statement

119.    On July 7, 2011, the Schedule 14A Definitive Proxy Statement (the "Proxy Statement") was filed with the SEC (and dated the same day). The Proxy Statement invited MF Global's shareholders to the Company's 2011 Annual Shareholders Meeting (the "Shareholders Meeting") which was held on August 11, 2011. In connection with the Shareholders Meeting, the Proxy Statement set forth certain business matters that would be discussed and voted on at the Shareholders Meeting, including: (i) the election of eight directors of MF Global to hold office until the next Annual Shareholders' Meeting; (ii) an advisory vote to approve the compensation of the Company's officers; (iii) an advisory vote to approve the frequency of future "say-on-pay" votes; (iv) approval of the 2011 Executive Incentive Plan; (v) ratification of the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for fiscal 2012; and (vi) approval of the issuance of shares of common stock upon the exercise of warrants issued in connection with the Company's 1.875% convertible senior notes due 2016 in excess of New York Stock Exchange limits for issuances without shareholder approval.

120.    The Proxy Statement contained the statements discussed below, which were, at the time and in light of the circumstances under which they were made, false or misleading with

42

respect to material facts, stated material facts requiring correction based upon subsequent facts

and events, and/or omitted material facts necessary to prevent such statements from being false

or misleading.

121.    The Proxy Statement provided shareholders with information concerning the role

of the Company's Board of Directors, made up of the Defendants (except Defendant

Steenkamp), in providing risk oversight and control.  The Proxy Statement specifically stated:

> The Board has responsibility for providing direction and oversight
> for management of the Company's business and affairs,
> establishing the Company's long-term objectives and strategy
> while overseeing the Company's business performance and
> management, including risk management.  The Company's
> enterprise risk management approach flows from the Board, which
> determines the Company's risk appetite, and permeates through the
> Company via a culture that expects all employees to function as
> risk managers.  *This approach involves a strong governance*
> *structure that clearly defines responsibilities, delegated*
> *authorities for risk control as well as risk-taking and documented*
> *policies designed to identify, measure, control and mitigate risk.*
>
> *The Company's risk appetite, as defined by the Board, recognizes*
> *the need for purposeful and appropriate risk-taking in the*
> *Company's efforts to execute its strategy and subsequently*
> *achieve its objectives.  The risk appetite translates to defined risk*
> *tolerances and, subsequently, delegations of authority and*
> *concomitant controls designed to ensure Company operation*
> *within those risk tolerances.*

122.    These above statements concerning the role of MF Global's Board of Directors in

providing risk oversight and control were materially false and misleading and omitted material

facts required to make the statements not misleading.  At the time the Defendants caused MF

Global to make these statements in the Proxy Statement:

> a.      The Defendants completely abdicated their oversight role and
> responsibility in connection with providing sound risk management to the
> Company and ceded all risk management to allow Defendant Corzine to

43

make unreasonably risky bets by recklessly investing in billions of dollars of European sovereign debt risking the Company's solvency; and

b.  MF Global's "risk appetite" failed to recognize the need for appropriate risk taking and ignored the fact that the Company's European sovereign debt holdings placed severe liquidity pressures on the Company.

### 3.  July 28, 2011 Form 8-K

123.  On July 28, 2011, MF Global issued a press release announcing its first quarter 2012 earnings, which the Company attached to a Form 8-K (the "July 28, 2011 Form 8-K"). Among other things, the Company reported that its:  (i) net revenue increased by 9% from $314.5 million versus $289.4 million for the same period last year; (ii) net income was $7.7 million, or $0.05 per basic and diluted share compared with $0.8 million, or $0.01 per basic and diluted share for the same period last year; and (iii) employee compensation and benefits expense (excluding non-recurring IPO awards) was $171.1 million, or 54.4% of net revenue, for the fiscal quarter ended June 30, 2011, compared with $155.4 million, or 53.7%, for the same period last year.

124.  Defendant Corzine touted the Company's financial results as being part of the Company's successful transition from a broker-dealer into a full-service investment bank, stating "[w]ith net revenue and GAAP income at their highest levels in nearly three years, this quarter's results reflect continued progress in MF Global's ongoing transformation . . . . We have made important strides in diversifying our revenue streams, expanding our trading capacity and upgrading talent, as well as in investing in the infrastructure necessary to execute our vision.  We believe the depth and breadth of our transformation will continue as we enhance our capital markets offering, focus our global retail services, and more effectively organize our prime services capabilities."

44

125.   Defendants also caused MF Global to make reference to the 3.375% Notes

Offering in connection with the Company's purported ability to "assess" the Company's "capital

structure" and to allow it to enhance its liquidity.  Specifically, the July 24, 2011 Form 8-K

stated:

> We continue to regularly assess our capital structure and
> opportunities to access the capital markets to reposition or
> restructure our capital structure by extending the maturities of our
> outstanding debt, including amounts currently drawn under our
> liquidity facility.  For example, on June 29, 2011, our U.S. broker-
> dealer closed a new, 364-day, $300 million senior secured
> committed revolving credit facility with a syndicate of banks.  *The
> credit facility can be used for general corporate purposes, which
> further increases our liquidity.  Our management continues to
> consider the appropriate debt structure, both for our existing
> business and our future growth, as well as the level of usage of
> our liquidity facility and the amount of preferred stock and
> convertible notes that we have outstanding.*  Factors that our
> management considers with respect to any repositioning or
> restructuring include the implementation of our strategic plan,
> rating agency viewpoints, adequacy of our permanent capital,
> attaining profitability, and the return on investment for our
> shareholders.  *We believe that the proposed issuance of
> convertible notes, which we announced earlier today, as well as
> our intention in the near-term, subject to market conditions, to
> actively pursue opportunities to raise additional capital through
> the sale of senior unsecured indebtedness, may improve many of
> the foregoing factors.*

126.   These above statements concerning MF Global's capital structure, liquidity, and

the purported use of the Company's revolving credit facility and working capital were materially

false and misleading and omitted material facts required to make the statements not misleading.

At the time Defendants caused MF Global to make these statements in the July 24, 2011 Form 8-

K:

> a.     Defendants completely disregarded MF Global's liquidity risk and its
> insufficient liquidity and working capital to support the then-devaluation
> of billions of dollars of European sovereign debt held by the Company;

45

b.    MF Global was suffering from severe liquidity pressures based on its
exposure to the European debt crisis through its enormous holdings of
European sovereign debt;

c.    MF Global was materially undercapitalized;

d.    MF Global's U.S. operating subsidiary, MF Global Inc., had a required net
capital *deficiency* in violation of SEC Rule 15c3-1 arising out of the lack
of capital the Company had for certain repurchase transactions backed by
European sovereign debt; and

e.    MF Global's revolving credit facility and issuance of the 3.375% Notes
(as well as the 6.25% Notes) was not for "general corporate purposes" but
rather Defendants' desperate attempt to provide liquidity to cover margin
calls and other cash demands on the Company's crippling $6.3 billion
investment in European sovereign debt, which assets were deteriorating in
value.

### 4.    First Quarter 2012 Form 10-Q

127.    On August 3, 2011, the Company filed its fiscal first quarter 2012 Form 10-Q

with the SEC ("First Quarter 2012 Form 10-Q"), which was signed by Defendants Corzine and

Steenkamp.  The First Quarter 2012 Form 10-Q was incorporated by reference into the August 3,

2011 Prospectus Supplement for the 6.25% Notes Offering.  The First Quarter 2012 Form 10-Q

was the second public filing in which Defendants caused the Company to disclose its European

sovereign debt which, as of June 30, 2011, had increased to $6.4 billion.

128.    Given this highly risky position, Defendants caused MF Global to make numerous

materially false and misleading statements in the First Quarter 2012 Form 10-Q concerning the

Company's:  (i) ability to effectively and responsibly manage risk; (ii) adequate liquidity; and

(iii) internal controls.

EC.47081.3

>    a.    **Materially False and Misleading Statements and Omissions of Material Fact Concerning MF Global's Risk Management Protocols and Processes**

129.    Similar to MF Global's 2011 Form 10-K, Defendants caused the Company to detail its purported "effective risk management" protocols and processes which was "critical to the success of its business." Specifically, the First Quarter 2012 Form 10-Q stated:

> The Company is exposed to numerous risks in the ordinary course of its business, and effective risk management is critical to the success of its business. ***The Company has a comprehensive risk governance structure and management processes through which the Company monitors, evaluates, and manages the risks the Company assumes in conducting its business.***

130.    The First Quarter 2012 Form 10-Q described MF Global's risk governance framework that involved "the oversight of its Board of Directors together with the Company's risk oversight committees, policies and procedures, and defined delegation of authority. The Company's Board-approved risk appetite and strategic objectives translate to defined risk tolerances and oversight processes and, subsequently, strictly enforced delegations of authority and concomitant controls, which are designed to ensure its operation within those risk tolerances."

131.    Moreover, the First Quarter 2012 Form 10-Q detailed the role and responsibility of the Company's various risk oversight committees, stating:

> ***The risk oversight committees monitor and manage risk company-wide and report on risk at the Board and senior management levels. Dedicated committees address various financial, non-financial and regional risks. The Company's senior management leads and actively participates in many of these risk committees.*** Risk officers are active participants in many strategic and business committees. The Company believes that effective risk management is only possible with effective communication and maintaining an open dialogue between the

EC.47081.3

Board, senior management, business areas, and the Risk department.

*The enterprise risk management framework employs this governance structure, which is intended to embed a strong risk culture and clearly define roles and responsibilities for risk taking, processing, reporting, and control. The enterprise risk management framework comprises the activities and methods through which the Company maintains risk within acceptable risk tolerances.* Business areas, pursuant to delegated authority, have primary responsibility for risk management. *Working with the business areas, the Risk department seeks to identify, assess, measure, monitor and limit the risks consistently across the Company's businesses.* The internal audit department and audit committee further provide independent control and assurance of the risk-management process.

132.    The First Quarter 2012 Form 10-Q also ensured investors that MF Global

established limits for each of its businesses in taking risk for its revenue-generating activities:

*Processes and procedures are key components of the Company's risk management.* The basis for its culture regarding risk-taking activities is the risk appetite. *The Company establishes limits for each of its businesses based on its risk appetite, which is set by the Board. Business areas, pursuant to delegated authority, have primary responsibility for risk management by balancing their ability to profit from revenue-generating activities with their exposure to potential losses.* Working with the business areas, the Risk department established a suite of limit techniques including, but not limited to, mandate limits applicable to specific businesses and risk types, value-at-risk, and stress scenario testing.

*The Company has established and documented mandates for market risk assumed by its revenue-generating areas.* For certain revenue-generating areas the risk mandates are supplemented with intra-day and overnight monitoring against the prescribed limits, both by the business areas and the Risk department. The Market Risk department quantifies and assesses risks, and escalates breaches to risk limits.

*                    *                    *

*The Company's senior management is responsible for implementing the risk management framework.* The Company continually seeks to improve its technology and processes. In

48

addition, the Company believes that effective risk management requires its people to make judgments, interpretations and key business decisions that cannot entirely be controlled by process and technology. ***The Company strives to build a strong risk management team, which works closely with its management and business areas to deliver effective risk management.*** The Company's Risk department managers provide the additional support in understanding and controlling the nuances and limitations of the risk measures deployed.

133.    These above statements concerning MF Global's ability to effectively manage, assess, and evaluate risk were materially false and misleading and omitted material facts required to make the statements not misleading.  At the time Defendants caused MF Global to make these statements in the First Quarter 2012 Form 10-Q:

a.    The Defendants, led by Corzine, completely disregarded the Company's purported risk management protocols in their aggressive pursuit to transform MF Global from a broker-dealer into a full-service investment bank and to increase its proprietary trading by recklessly investing in billions of dollars of European sovereign debt risking the Company's solvency;

b.    MF Global's risk management protocols and processes failed to adequately assess risk in its own proprietary trading, including MF Global's exposure to billions of dollars of European sovereign debt;

c.    MF Global's risk management protocols and processes were insufficient to detect the severe liquidity pressures the Company faced in connection with the $6.4 billion invested in European sovereign debt; and

d.    MF Global was hiding its true risk-taking activities by materially reducing short-term borrowings each quarter shortly before reporting its quarterly results.

134.    Similar to the Company's 2011 Form 10-K, MF Global defined "market risk" as "the risk of loss due to changes in the value of financial instruments, positions and investments resulting from fluctuations in the level of market factors."  A part of MF Global's market risk involved its exposure to "the credit worthiness of the issuer," including the specific European countries that issued the sovereign debt that collateralized MF Global's repurchase agreements.

49

In specifying the market risk that MF Global was exposed to, the First Quarter 2012 Form 10-Q

stated:

> The Company is exposed to market risk from its market making
> and client facilitation principal activities, proprietary activities,
> other company investments, and treasury operations. The
> Company's treasury and other company investments include those
> made for cash and asset liability management, including held-to-
> maturity investments and repo-to-maturity transactions . . . . A
> repo-to-maturity transaction is a repurchase agreement that
> matures on the same date as the underlying collateral. The market
> risks the Company is exposed to in held-to-maturity and repo-to-
> maturity activities include, but are not limited to, interest rate,
> credit spread, rating downgrade and issuer default risks.

> The Company is exposed to market risk from its market making
> and client facilitation principal activities and proprietary activities
> through the positions the Company carries in debt and fixed
> income securities and through the investments the Company makes
> related to client cash and margin balances.

135.    To purportedly protect itself from the exposures to market risk, MF Global

explained in the First Quarter 2012 Form 10-Q that:

> ***The Company manages these exposures by limiting the size and
> concentration of positions that it holds in accordance with its risk
> appetite and in accordance with instructions from the delegated
> authorities, both approved by the Board.*** The risk taken by its
> business areas, especially its revenue-generating areas, is approved
> in defined risk mandates as delegated by the CRO. The
> Company's business areas are responsible for these risks and are
> expected to operate within these prescribed mandates. Business
> areas are also responsible for managing their risk-revenue
> expectations in collaboration with the Risk department. ***End-of-
> day, and for certain businesses, intra-day monitoring processes
> mitigate risk taking in excess of the Company's risk appetite.***

136.    These above statements concerning MF Global's management of market risk,

including the risk from the Company's proprietary investment activities in European sovereign

debt, were materially false and misleading and omitted material facts required to make the

statements not misleading.  At the time Defendants caused MF Global to make these statements

in the First Quarter 2012 Form 10-Q:

> a.  The Defendants, led by Corzine, completely disregarded the Company's purported risk management protocols in their aggressive pursuit to transform MF Global from a broker-dealer into a full-service investment bank and to increase its proprietary trading by recklessly investing in billions of dollars of European sovereign debt risking the Company's solvency;
>
> b.  MF Global's risk management protocols and processes failed to limit the size and concentration of its exposure to billions of dollars of European sovereign debt and, in fact, the Company *increased* its holdings and corresponding risk in European sovereign debt; and
>
> c.  MF Global's risk management protocols and processes were insufficient to detect the severe liquidity pressures and related market risks the Company faced in connection with the $6.4 billion invested in European sovereign debt.

### b.  Materially False and Misleading Statements and Omissions of Material Fact Concerning the Adequacy of MF Global's Liquidity and Working Capital

137.    In the First Quarter 2012 Form 10-Q,  Defendants continued to cause the

Company to disseminate materially false and misleading statements concerning the adequacy of

MF Global's liquidity and working capital.

138.    For example, the First Quarter 2012 Form 10-Q assured investors of MF Global's

"multiple sources of liquidity," stating in part:

> ***The Company has multiple sources of liquidity and expects its primary liquidity needs over the next 12 months to be for working capital, debt service obligations and preferred dividend obligations***.  Subject to the discussion below regarding its changing liquidity needs as a result of the implementation of its strategic plan, ***the Company believes it will have sufficient liquidity to meet these obligations given its expected cash flows from operations and its available sources of liquidity***.

51

139.    In touting its liquidity position, MF Global reported that it had different sources of liquidity, including:  (i) a $1.2 billion "liquidity facility," of which only $342 million had been used as of June 30, 2011; (ii)  its U.S. regulated broker-dealer subsidiary's committed $300 million 364-day secured revolving credit facility; (iii) available excess capital in its regulated subsidiaries; (iv) available excess cash held in the bank accounts of non-regulated subsidiaries; and (v) customer collateral.  Additionally, the First Quarter 2012 Form 10-Q stated that MF Global "*believes that its current working capital is more than sufficient for its present requirements*."

140.    Defendants also assured investors in the First Quarter 2012 Form 10-Q that "as a matter of policy, the Company maintains excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events."

141.    The First Quarter 2012 Form 10-Q also informed investors of potential liquidity risks that the Company "*may be exposed to*," including "cash liquidity risk under adverse market conditions or unexpected events."  However, the First Quarter 2012 Form 10-Q reassured investors that the Company's "*policy requires it to have sufficient liquidity to satisfy all of its expected cash needs for at least one year without access to the capital markets* . . . . To manage its liquidity risk, the Company has established a liquidity policy designed to ensure that the Company maintains access to sufficient, readily available liquid assets and committed liquidity facilities."

142.    These above statements concerning MF Global's liquidity and working capital were materially false and misleading and omitted material facts required to make the statements

52

not misleading.  At the time Defendants caused MF Global to make these statements in the First

Quarter 2012 Form 10-Q:

      a.      Defendants completely disregarded MF Global's liquidity risk and its insufficient liquidity and working capital to support the then-devaluation of billions of dollars of European sovereign debt held by the Company;

      b.      MF Global was suffering from severe liquidity pressures based on its exposure to the European debt crisis through its enormous holdings of European sovereign debt;

      c.      Defendants knew that the liquidity risks that the Company *may* be exposed to were in fact already present causing the Company to lack sufficient liquidity and working capital to cover margin calls and other cash demands in connection with its European sovereign debt holdings;

      d.      MF Global was misappropriating over a billions dollars in client money to cover margin calls and other cash demands in connection with its European sovereign debt holdings; and

      e.      MF Global was materially undercapitalized.

      143.    The First Quarter 2012 Form 10-Q stated that the Company was in compliance

with "defined capital requirements" set forth by certain regulatory bodies, including the SEC,

FINRA, and the CFTC, for MF Global's operating subsidiaries as of June 30, 2011.  Specifically,

the First Quarter 2012 Form 10-Q stated:

> The Company conducts its securities and commodities businesses
> though several regulated subsidiary entities around the world
> which are subject to the rules and regulations of the applicable
> local supervisory authorities and principal exchanges of which they
> are members.  These supervisory authorities and exchanges each
> have defined capital requirements which the respective subsidiaries
> of the Company are subject to.  The two principal subsidiary
> entities of the Company conducting such business are MFGI in the
> U.S. and MF Global UK Limited ("MGFUKL") in the U.K.
> MFGI, a futures commission merchant and securities broker-
> dealer, is required to maintain minimum net capital equal to the
> greater of the amount required by the SEC or CFTC, as defined.
> At June 30, 2011, MFGI had net capital, as defined, of $570,931,
> net capital requirements of $399,976, and excess net capital of
> $170,955.

53

>MFGI is subject to certain notifications and other provisions of the
>net capital rules of the SEC regarding advances to affiliates,
>repayments of subordinated liabilities, dividend payments and
>other equity withdrawals. At June 30, 2011, MFGI was in
>compliance with all of these provisions.

144.    In connection with the necessary regulatory capital requirements, MF Global also disclosed purported risks of failing to maintain required capital at its operating subsidiaries at or above specified minimum levels mandated by various regulators. The First Quarter 2012 Form 10-Q explained that "[v]arious domestic and foreign government regulators, as well as self-regulated organizations (such as exchanges), with supervisory responsibility over its business activities require the Company to maintain specified minimum levels of regulatory capital in its operating subsidiaries." The Company further stated that to "mitigate this risk," it:

>*[C]ontinuously evaluates the levels of regulatory capital at each
>of its operating subsidiaries and adjusts the amounts of
>regulatory capital as necessary to ensure compliance with all
>regulatory capital requirements.* Regulatory authorities may
>increase or decrease these requirements from time to time. *The
>Company also maintains internal early warning levels and excess
>regulatory capital to accommodate periods of unusual or
>unforeseen market volatility, and the Company intends to
>continue to follow this policy. In addition, the Company
>monitors regulatory developments regarding capital
>requirements and prepares for increases in the required
>minimum levels of regulatory capital that may occur in the
>future.* If not properly monitored and adjusted, its regulatory
>capital levels could fall below the required minimum amounts set
>by its regulators, which could expose the Company to various
>sanctions ranging from fines and censure to partial or complete
>restrictions on its ability to conduct business.

145.    These above statements were materially false and misleading and omitted material facts required to make the statements not misleading. While MF Global touted it ability to comply with the specified levels of regulatory capital for its U.S. broker-dealer subsidiary for the

54

period ended June 30, 2011, MF Global and the Defendants had been warned by U.S. regulators, including FINRA and the SEC, that the Company was operating out of compliance with certain regulatory capital requirements. Indeed, FINRA forced the Company to set aside additional capital over its concern about its repurchase agreements that were backed by European sovereign debt. On October 17, 2011, The *Wall Street Journal* reported that MF Global was suffering from a deficit of approximately $150 million in "excess net capital" for the month of July due to its European sovereign debt holdings. Given this deficient, the Company was not in compliance with SEC Rule 15c3-1.

146.    It was not until September 1, 2011 – approximately one month after the Company completed the Offerings – that MF Global amended its First Quarter 2012 Form 10-Q and stated:

> As previously disclosed, the Company is required to maintain specific minimum levels of regulatory capital in its operating subsidiaries that conduct its futures and securities business, which levels its regulators monitor closely. The Company was recently informed by the Financial Industry Regulatory Authority, or FINRA, that its regulated U.S. operating subsidiary, MF Global Inc., is required to modify its capital treatment of certain repurchase transactions to maturity collateralized with European sovereign debt and thus increase its required net capital pursuant to SEC Rule 15c3-1. MF Global Inc. has increased its net capital and currently has net capital sufficient to exceed both the required minimum level and FINRA's early-warning notification level. The Company does not believe that the increase in net capital will have a material adverse impact on its business, liquidity or strategic plans. In addition, the Company expects that its regulatory capital requirements will continue to decrease as the portfolio of these investments matures, which currently has a weighted average maturity of April 2012 and a final maturity of December 2012.

147.    Although Defendants knew that MF Global had a required net capital deficit *prior* to the time of the two Offerings, Defendants never disclosed this fact in the Public Offering Materials, including neither the July 28, 2011 Prospectus Supplement nor the August 3, 2011 Prospectus Supplement.

55

c.      **Materially False and Misleading Statements and Omissions of Material Fact Concerning MF Global's Internal Controls**

148.    The First Quarter 2012 Form 10-Q assured investors that the Company continued to have effective internal controls over financial reporting:

> As of the end of the period covered by this report, an evaluation was carried out under the supervision and with the participation of the Company's management, including its Chief Executive Officer and Chief Financial Officer, of the effectiveness of its disclosure controls and procedures (as defined in Rule 13a-15(e) under the U.S. Securities Exchange Act of 1934 (the "Exchange Act")). Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures were effective as of and for the period covered by this report.  In addition, no change in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) occurred during its most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, its internal control over financial reporting.

149.    The First Quarter 2012 Form 10-Q also included certifications signed by Defendants Corzine and Steenkamp pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which represented that the Company's financial statements did not contain material misstatements or omissions, and that the Company employed internal disclosure controls over financial reporting and related disclosures.

150.    In this regard, the First Quarter 2012 Form 10-Q contained a certification signed by Defendant Corzine, which stated:

> I, Jon S. Corzine, certify that:
>
> 1.      I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2011 of MF Global Holdings Ltd.;
>
> 2.      Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a

56

material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

\*               \*               \*

5.   The Registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

151.   The First Quarter 2012 Form 10-Q contained a separate certification signed by Defendant Steenkamp, which contained a verbatim reproduction of Defendant Corzine's certification statements above.

152.   Moreover, the First Quarter 2012 Form 10-Q contained certifications signed by Defendant Corzine, which stated in pertinent part that:

In connection with the Quarterly Report of MF Global Holdings Ltd. . . . on Form 10-Q for the quarter ended June 30, 2011 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Jon S. Corzine, Chief Executive Officer of the Company, certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that:

57

        1.     the Report fully complies with the requirements of
Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

        2.     the information contained in the Report fairly
presents, in all material respects, the financial condition and results
of operations of the Company.

153.    The First Quarter 2012 Form 10-Q contained an identical certification pursuant to

18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed

by Defendant Steenkamp.

154.    The above certifications and statements concerning MF Global's internal controls

and the accuracy and completeness of the First Quarter 2012 Form 10-Q were materially false

and misleading and omitted material facts required to make the statements not misleading

because MF Global's internal controls were ignored and/or severely deficient and, thus, allowed

the Company to: (i) invest in $6.4 billion of highly risky European sovereign debt that was

deteriorating in value causing a negative impact on the Company's credit rating; (ii) understate

liquidity and necessary working capital based upon its exposure to the devaluation of the

European sovereign debt; (iii) hide the true risks that its exposure to the European sovereign debt

had on the financial viability of the Company; and (iv) misappropriate over a billion dollars in

client money to cover margin calls and other cash demands in connection with MF Global's $6.4

billion investment in European sovereign debt, which assets continued to deteriorate in value.

### 5.    August 3, 2011 Form 8-K

155.    On August 3, 2011, MF Global filed its current report on Form 8-K stating that

the closing of the July 28, 2011 Offering occurred on August 2, 2011 (the "August 3, 2011 Form

8-K"). The August 3, 2011 Form 8-K was incorporated by reference into the August 3, 2011

Prospectus Supplement in connection with MF Global's 6.250% Notes Offering. The August 3,

2011 Form 8-K also indicated that the Company used more than half of the proceeds "for general

corporate purposes and to repay amounts outstanding under the Company's $1.2 billion unsecured, committed revolving credit facility."

156.    The August 3, 2011 Form 8-K was materially false and misleading and omitted material facts required to make the statements not misleading.  Far from just using the net proceeds from the Offerings for "general corporate purposes," Defendants knew that the majority of net proceeds were desperately needed to provide required liquidity and working capital given the then-deterioration in value of MF Global's $6.4 billion holdings of European sovereign debt. In fact, as first disclosed by The *Wall Street Journal* on October 17, 2011, in July 2011, Defendants knew that the Company had a net *deficit* of approximately $150 million in required net capital for "certain repurchase transactions" that were backed by European sovereign debt. FINRA required MF Global to add capital to its U.S. broker-dealer subsidiary to make up for this deficit in or around the time that the Company received the net proceeds from the two Offerings. Although FINRA and other U.S. regulators informed Corzine and the Company's other senior management of the need to add more capital to cover the deteriorating assets values of its European sovereign debt in June 2011, Defendants failed to disclose this fact to Plaintiff and other Class Members who purchased the Bond Class Securities in the Offerings.

## VII.    CLASS ACTION ALLEGATIONS

157.    Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired the debt securities in or traceable to the July 28, 2011 Offering and/or the August 3, 2011 Offering, and were damaged thereby.  Excluded from the Class are Defendants, their respective officers and directors (current

and former), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest.

158.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff reasonably believes that there are thousands of members in the Class. Record owners and other members of the Class may be identified by records maintained by Defendants and their transfer agents, and may be notified of the pendency of the action by mail, the internet or publication using the form of notice similar to that customarily used in securities class actions.

159.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' violations of the Securities Act of 1933.

160.    Plaintiff will fairly and adequately represent the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

161.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. These common questions of law and fact include:

        a.   whether Defendants violated the Securities Act of 1933 as alleged herein;

        b.   whether the Public Offering Materials contained materially false and misleading statements and/or omitted statements of material fact; and

        c.   the extent of damages suffered by the Class, and the proper measure of damages.

162.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to obtain individual redress.  There will be no difficulty in the management of this action as a class action.

## VIII.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

163.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.

164.    First, none of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.  Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

165.    To the extent any of the false and misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the Company's business and financial condition and its purported compliance with GAAP.

## IX.   CAUSES OF ACTION

### COUNT I

### For Violations Of Section 11 Of The Securities Act Against the Defendants

166.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

167.    This Count is asserted against the Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of members of the Class who purchased or otherwise acquired the Bond Class Securities pursuant to or traceable to the materially false and misleading Shelf Registration Statement and Public Offering Materials incorporated by reference into the Registration Statement, and were damaged thereby.

168.    Each Defendant is liable in connection with those Offerings:  (a) made at a time when the Defendant was a director (and/or officer) of the issuer; or (b) made pursuant to the Shelf Registration Statement that the Defendant signed.  The descriptions of each Defendant at ¶¶ 26-34 above identify the Offerings for which such Defendant is liable pursuant to this Count.

169.    The Registration Statement, including the Public Offering Materials incorporated by reference therein at the time of each Offering, contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading.

170.    Each of the Defendants is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Shelf Registration Statement and incorporated Public Offering Materials.  The Defendants did not make a reasonable investigation or possess reasonable grounds to believe that those statements were true and that there were no omissions of any material fact.  Accordingly, the Defendants acted negligently and are therefore liable to Plaintiff and the other members of the Class who purchased the Bond Class Securities.

62

171.   Plaintiff and other Class Members purchased Bond Class Securities issued under or traceable to the Shelf Registration Statement.

172.   Plaintiff and other Class Members did not know, nor in exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Shelf Registration Statement and incorporated Public Offering Materials when they purchased or acquired their Bond Class Securities.

173.   The value of the Bond Class Securities has declined substantially subsequent to the consummation of the Offerings and Plaintiff and Other Class Members have sustained damages.

174.   Less than one year elapsed between the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based and the time this Complaint was filed asserting claims arising out of the falsity of the Shelf Registration Statement and incorporated Public Offering Materials. Less than three years elapsed between the time that the securities at issue in this Complaint were bona fide offered to the public and the time that this Complaint was filed asserting claims arising out of the falsity of the Shelf Registration Statement and incorporated Public Offering Materials.

175.   This claim does not sound in fraud. For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

176.   By reason of the foregoing, the Defendants are liable for violations of Section 11 of the Securities Act to Plaintiff and other Class Members who purchased or otherwise acquired Bond Class Securities pursuant to the Shelf Registration Statement.

63

## COUNT II

### For Violations Of Section 15 Of The Securities Act Against the Defendants

177.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

178.     This Count is asserted against the Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiff and the other members of the Class who have asserted claims pursuant to Section 11 of the Securities Act, as set forth above.

179.     During their times as Officers and/or Directors of MF Global, the Defendants were controlling persons of MF Global within the meaning of Section 15 of the Securities Act.

180.     Each Defendant, at the time they were an Officer and/or Director of MF Global, participated in the operation and management of MF Global, and conducted and participated, directly and indirectly, in the conduct of the business affairs of MF Global.  Because of their positions of control and authority as Officers and/or Directors of MF Global, the Defendants were able to, and did control the contents of the Shelf Registration Statement and the incorporated Public Offering Materials, which contained materially untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

181.     This claim does sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

182.     By virtue of the Defendants' control over MF Global, the Defendants are named herein as Defendants under Section 15 of the Securities Act with respect to the Bond Class Securities issued by MF Global.

64

183.    By reason of the aforementioned conduct, each of the Defendants is liable under Section 15 of the Securities Act to Plaintiff and other Class Members who have asserted claims pursuant to Section 11 of the Securities Act, as set forth above.  As a direct and proximate result of the conduct of the Defendants, Plaintiff and other Class Members suffered damages in connection with their purchase or acquisition of Bond Class Securities.

## X.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on its own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding compensatory damages in favor of Plaintiff and other Class Members against all Defendants, jointly and severally, for all of the damages sustained as a result of the wrongdoings of Defendants, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Granting such other and further relief as the Court may deem just and proper.

65

## XI.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  December 6, 2011

Respectfully Submitted,

Vincent R. Cappucci, Esq.
Arthur V. Nealon, Esq.
Robert N. Cappucci, Esq.
Jordan A. Cortez, Esq.
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor West
New York, New York 10017
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272

Attorneys for Plaintiff and the Class

66

EC.47081.3